* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * *Page 2 RULING ON MOTION
At the Full Commission, Plaintiff moved for admission into evidence his Official Transcript from Virginia College at Birmingham (dated January 11, 2007) and his Transcript from Randolph Community College (dated March 14, 2007). Plaintiff's motion is granted and the transcripts are hereby received into evidence.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. The Industrial Commission has jurisdiction over the parties and of the subject matter, and an employer-employee relationship existed between Plaintiff and Defendant at the time of Plaintiff's injury.
2. Defendant was an approved self-insured at all relevant times.
3. Liberty Mutual is currently the third-party administrator for Defendant. The previous third-party administrator for Defendant was Frank Gates Service Co.
4. This case was accepted on an I.C. Form 60 on February 13, 1998.
5. On July 6, 1998, the third-party administrator completed an I.C. Form 62, stating that Plaintiff had gone out of work on June 12, 1998. Plaintiff has received ongoing temporary total disability benefits in the amount of $424.35 per week from June 12, 1998, to the present.
 6. Plaintiff is receiving Social Security disability benefits. *Page 3 
7. On January 25, 2001, immediately prior to a January 26, 2001, Deputy Commissioner hearing, Defendant entered into a stipulation, agreeing to continue Plaintiff's temporary total disability benefits through the completion of his Associate's Degree in Applied Science at Randolph Community College, based upon the understanding that the Associate's Degree would be completed by the end of December 2001.
8. On January 29, 2001, Defendant agreed to pay for Plaintiff's mileage to and from Randolph Community College and for his books for the fall, spring, and summer semesters of 1999 and for the summer semester of 2001. Defendant also agreed to cover Plaintiff's fall 2001 semester books and mileage if he did not obtain a Pell Grant, upon provision of appropriate receipts. Defense counsel notified Plaintiff's counsel that Defendant would do a labor market survey and initiate job search activities at the completion of Plaintiff's Associate's Degree.
9. Plaintiff completed his Associate's Degree in Applied Science at Randolph Community College on May 11, 2002.
10. On July 17, 2002, Plaintiff notified Sharol Siler of Armstrong and Associates' vocational rehabilitation services that he was experiencing increased low back and leg pain.
11. On August 19, 2002, Plaintiff began taking classes at UNC-Greensboro to complete a Bachelor of Science Degree in Information Science.
12. On July 30, 2003, Plaintiff underwent an employability assessment with Anissa Rice, a vocational rehabilitation consultant with Cascade Disability Management, Inc., at Defendant's request.
13. Plaintiff is continuing to receive vocational rehabilitation services from the State of North Carolina Division of Vocational Rehabilitation Services. *Page 4 
14. Plaintiff alleges that due to the exacerbation of his back pain, he was unable to continue commuting to UNC-Greensboro. In 2003, Plaintiff began studying online to complete his Bachelor's Degree. Plaintiff planned to specialize in computer security systems.
15. Plaintiff underwent an L5-Sl discectomy in August 1997. On April 15, 2004, Plaintiff underwent a fusion at L5-Sl. Plaintiff is currently receiving prescription pain medications through his family physician as a result of his compensable injury by accident.
16. The parties agreed to stipulate into evidence all Industrial Commission Orders and Industrial Commission forms filed with the Industrial Commission in this case.
17. Plaintiff represents that he has been treated and/or evaluated by the following health care providers and the medical records from those providers have been stipulated into evidence: White Oak Family Physicians; Craig Derian, M.D.; Armstrong Associates; Russell Amundson, M.D., at The Johnson Neurological Clinic, Inc.; Asheboro Rehabilitation Center; Microneurosurgical Specialists of Central Carolina; Daniel Collins, M.D.; The Rehab Center; Danville Regional Medical Center; Randolph Hospital; and Karen Caviness at North Carolina Department of Vocational Rehabilitation Services.
18. The contested issues before the Commission according to Plaintiff are:
 a.) Is Plaintiff entitled to complete his Bachelor's degree in computer science, so that he can regain his pre-injury earning capacity, accommodate his substantial work restrictions, and find suitable employment?
 b.) Is Defendant equitably estopped from changing Plaintiff's course of study and trying to do a job search again, after Defendant obtained multiple vocational evaluations that showed Plaintiff's unemployability without further education and after Defendant failed to take any contradictory *Page 5 
action for the past three years and Plaintiff has detrimentally relied on Defendant's conduct?
 c.) Is Defendant liable for reimbursement of Plaintiff's accrued student loans and payment of his future college tuition and fees, given Plaintiff's limitation to online college programs that are in large part not covered by the State of North Carolina Division of Vocational Rehabilitation Services?
 d.) Is Plaintiff entitled to ongoing temporary total disability benefits until he completes his education and obtains suitable employment close to his pre-injury wage earning capacity and within his work restrictions?
 e.) Is Defendant subject to sanctions under N.C. Gen. Stat. § 97-88.1 for unreasonably prosecuting and defending this case, including attorney's fees and costs, by filing a Form 33 with no good faith basis and by refusing to pay for vocational retraining?
 f.) Is Plaintiff entitled to any additional benefits under the Workers' Compensation Act?
 g.) Is Defendant liable for the payment for the N.C. Gen. Stat. § 97-27(b) IME performed by Dr. Paul Wright on July 19, 2005?
19. The contested issues before the Commission according to Defendant are:
 a.) Is Plaintiff entitled to vocational retraining beyond that which would return him to suitable employment?
 b.) Is Defendant responsible for providing such training, and is Plaintiff equitably estopped from pursuing payment for the same, since Defendant *Page 6 
has offered to pay for certain reasonable retraining, as long as it can direct the course work, and Plaintiff has refused said offer?
 c.) Is Plaintiff's current course of study the only option or the most likely option for returning him to suitable employment upon completion?
 d.) What is Plaintiff's current level of disability with respect to his ratings?
 e.) Does the Industrial Commission need to order Plaintiff to cooperate with the vocational rehabilitation consultant assigned to his file?
 f.) Has Plaintiff made misrepresentations to the Industrial Commission by claiming Defendant has failed to pay for Plaintiff's additional vocational retraining to enable Plaintiff to regain his pre-injury earning capacity?
 g.) Has Plaintiff's prosecution and defense of this case been brought without reasonable grounds, thus entitling Defendant to attorney's fees under N.C. Gen. Stat. § 97-88.1?
 * * * * * * * * * * *
Based on the foregoing Stipulations and the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the date of hearing before the Deputy Commissioner in this matter, Plaintiff was 57 years old. He completed two years of college at West Virginia University before he was drafted into the Marines during the Vietnam War. After the war, he was unable to complete his college degree, because he could not handle the courses at the time. Plaintiff obtained psychological counseling after his return from Vietnam. *Page 7 
2. At the time of his workers' compensation injury, Plaintiff was employed as a machine operator for Defendant. On May 12, 1997, Plaintiff pulled a muscle in his lower back while performing a dye "thread-up." This occurred while Plaintiff was moving his foot on a jog pedal of the threading machine when the machine stopped and jerked him.
3. On May 20, 1997, Plaintiff went back to regular duty and again pulled his back trying to lift a spool. Plaintiff later returned to work, but went out of work again on May 28, 1997.
4. At the time of his back injury, Plaintiff had been working for Defendant since 1986 as a fine-draw operator, running three different machines. To operate the machines, Plaintiff had to stand. Plaintiff's job with Defendant was classified as medium to heavy work.
5. A Form 60, completed on February 13, 1998, indicates that Plaintiff had an average weekly wage of $636.49, yielding a compensation rate of $424.35.
6. Dr. Russell H. Amundson of Johnson Neurologic Clinic diagnosed Plaintiff with a herniated lumbar disc and performed an L5-S1 laminetomy and microdiskectomy on August 13, 1997.
7. After the L5-S1 surgery Plaintiff tried to return to work for Defendant on a part-time basis on March 9, 1998. Plaintiff was not able to do the part-time work assigned. On June 6, 1998, Defendant executed a Form 62 and resumed payment of temporary total disability benefits to Plaintiff in the amount of $424.35 per week.
8. Plaintiff underwent a Functional Capacity Evaluation (FCE) in 1998, which indicated he could lift 20 pounds occasionally, 10 pounds frequently and negligible pounds continuously. Dr. Amundson indicated that if Plaintiff were unable to return to work within the limits of the FCE, he would support plans and efforts to enroll him in a vocational rehabilitation *Page 8 
program with job retraining and educational opportunities to help him return to gainful employment. On February 16, 1999, Dr. Amundson assigned a 15% permanent partial impairment rating to Plaintiff's back and gave him permanent light duty work restrictions consistent with the FCE.
9. On February 19, 1999, Defendant notified the medical case manager that it had no jobs available within Plaintiff's work restrictions on the FCE.
10. On March 17, 1999, Plaintiff, on his own, applied to the North Carolina Division of Vocational Rehabilitation Services (NCDVR) for assistance and underwent interest and aptitude testing. Plaintiff testified that he knew he "couldn't work in manual labor any more. I had to do something else." At that point, Defendant had not provided any vocational rehabilitation services.
11. Karen Caviness, a licensed counselor at the NCDVR for thirteen years with a Master's Degree in counseling, has worked with Plaintiff since March 1999. Ms. Caviness testified that Plaintiff's testing revealed he was "certainly capable" of completing a college curriculum and his interests fell into computer programming and computer technology.
12. Plaintiff enrolled in a keyboarding class at Randolph Community College in the spring of 1999. Ms. Caviness testified that Plaintiff was taking computer classes in the spring of 1999, and that she had to ensure that his interest in computers was compatible with his disability.
13. Defendant assigned a vocational rehabilitation consultant to provide services to Plaintiff from Armstrong Associates. On April 14, 1999, Plaintiff met with Sharol Siler, the vocational rehabilitation counselor. Ms. Siler noted that Plaintiff's physical capabilities precluded him from resuming his employment with Defendant. Plaintiff disclosed to Ms. Siler that he had met with NCDVR and his plans to pursue a computer training program because he *Page 9 
felt additional training would afford him an opportunity for earning potential comparable to his pre-injury wages.
14. On May 6, 1999, Plaintiff underwent an independent medical examination (IME) with Dr. T. Craig Derian at Plaintiff's request. Dr. Derian assigned a 20% permanent partial impairment rating to Plaintiff's back and the following work restrictions: no lifting over 15 lbs. occasionally and 5 lbs. frequently, and avoid prolonged or repetitive bending, lifting, and stooping and frequent position changes from sitting to standing to walking, etc. Dr. Derian further noted that Plaintiff should be allowed to use his own judgment concerning activities involving his back. Dr. Derian agreed with Plaintiff's plan to return to school for computer training.
15. Ms. Siler conducted a transferable skills assessment after her initial meeting with Plaintiff in April 1999. Ms. Siler found no jobs within a 30-45 mile radius of Plaintiff. She reported that it was possible that entry-level positions could be identified, but a significant wage differential would be anticipated.
16. Ms. Siler met with Plaintiff periodically from May through December 1999 to conduct job search activities. All the jobs they identified either exceeded Plaintiff's functional limitations, were not within his skill level, or paid close to minimum wage. She filed monthly reports with the parties, including the third party administrator, on Plaintiff's job search activities, his plan to obtain computer training through Randolph Community College, and later, concerning his participation in the Associate's Degree Program in Information Systems beginning the fall semester of 1999. Ms. Siler reviewed the Randolph Community College's computer training curriculum during one of her meetings with Plaintiff and determined that this curriculum was feasible for him. *Page 10 
17. Ms. Siler testified that Plaintiff's physical limitations restricted him to sedentary work and attempting to secure suitable employment for him was "tedious." She further testified that Plaintiff complied with the vocational rehabilitation services offered to him. In January 2000, Defendant suspended Plaintiff's job search activities.
18. In her May and June 2000 reports to Defendant, Ms. Siler documented Plaintiff's grade point average, Plaintiff's completed coursework, and his current courses. In her July 28, 2000 report, Ms. Siler documented that Plaintiff's file was to remain inactive until otherwise directed by the third-party administrator. On September 20, 2000, Ms. Siler was instructed to call Plaintiff monthly and see him quarterly to assess his academic status and progress. In her September 22, 2000 report, she noted that job placement activities would resume when Plaintiff approached graduation. Ms. Siler testified that, as of September 2000, Defendant's third-party administrator was agreeing to allow Plaintiff to complete his Randolph Community College education.
19. As of January 2001, Plaintiff began his fourth semester with a cumulative grade point average of 3.8 out of 4.0. Ms. Siler notified the carrier of Plaintiff's progress on January 11, 2001. In January 2001, she obtained the NCDVR records regarding Plaintiff and testified that her goals were consistent with the NCDVR goals for Plaintiff.
20. NCDVR paid Plaintiff's tuition and fees for the Randolph Community College program, but did not pay his transportation, books, and supplies. Plaintiff paid his own transportation costs, books, and supplies through the fall of 2000. On August 8, 2000, Plaintiff filed an I.C. Form 33, alleging that Defendant failed to pay for vocational retraining for Plaintiff. On January 25, 2001, one day before the scheduled hearing before the Deputy Commissioner, Defendant agreed to continue Plaintiff's temporary total disability benefits through the *Page 11 
completion of his Associate's Degree at Randolph Community College, and to pay for Plaintiff's mileage and books while enrolled at the Community College.
21. Plaintiff was originally scheduled to graduate in December 2001. Plaintiff testified, however, that in the spring of 2001, he received an incomplete in a systems class due to a computer virus, and the grade was converted to an F when he was unable to complete the class within two weeks after the semester ended. The required course was not available again until the spring of 2002. Plaintiff informed Ms. Siler about the computer virus and that the course was not offered again until the spring of 2002. Ms. Siler subsequently advised Plaintiff that Defendant had authorized him to retake the course during the spring semester of 2002. Defendant resumed Plaintiff's job search activities in February 2002; however, he was not able to find suitable employment. Plaintiff graduated from Randolph Community College in May 2002.
22. Ms. Caviness testified that she encouraged Plaintiff to pursue a four-year degree, because he was capable of performing at a Bachelor's level and an Associate's Degree would not give him the skills and qualifications he needed to obtain a job in the computer industry. On May 31, 2001, Plaintiff disclosed to Ms. Siler his plan to pursue a four-year degree at UNC-Greensboro. Ms Siler documented Plaintiff's plans to attend UNC-Greensboro in her May 21, June 25, September 14, and November 2, 2001, reports to Defendant and in her January 14, March 8, April 19, May 24, June 21, and August 16, 2002, reports to Defendant.
23. In the fall of 2001, Plaintiff told Ms. Siler that he was having increased difficulty sitting for long classes. Plaintiff testified that he developed lower back pain with constant pain going down his left buttock all the way down to his foot during the last semester at Randolph Community College. On March 13, 2002, Ms. Siler sent a fax to the adjuster, requesting a *Page 12 
follow-up appointment with Dr. Amundson for Plaintiff's increased lumbar pain. In her May 24, 2002, report, Ms. Siler documented Plaintiff's "significant intermittent back pain" and renewed his request for an appointment with his treating physician. She also renewed the request for medical treatment for Plaintiff in her June 21 and July 19, 2002, reports. By July 17, 2002, Plaintiff reported increased low back and leg pain and difficulty "getting about" due to his back symptoms. Ms. Siler documented in her August 15, 2002, report that she continued to work cooperatively with Plaintiff, and that the third-party administrator had approved an appointment for Plaintiff with Dr. Amundson on August 22, 2002.
24. With respect to Plaintiff's enrollment at UNC-Greensboro, Ms. Siler testified that she never told Plaintiff not to enroll, but she did tell him that they would have to continue job search activities while he was enrolled. Ms. Siler admitted that all the jobs she and Plaintiff located through job search activities during the time period she was assigned to his case required a Bachelor's Degree or significant work experience. She discussed Plaintiff's lack of education with Defendant's adjuster in October 2002. The adjuster did not tell her to stop Plaintiff from attending UNC-Greensboro.
25. On August 22, 2002, Plaintiff saw Mark Payne, Physician Assistant (P.A.) to Dr. Amundson. At this visit, Plaintiff reported a new problem of left leg numbness and P.A. Payne prescribed Neurontin, Celebrex, and Norflex.
26. When Plaintiff attended UNC-Greensboro, Plaintiff had to take out a student loan from the College Foundation to cover the tuition, fees, books, and supplies. Plaintiff borrowed a total of $7,500.00 from the College Foundation in July 2002. Ms. Caviness explained that the NCDVR could only pay $1,214.00 per semester towards Plaintiff's education at UNC-Greensboro. *Page 13 
27. During the fall of 2002, while enrolled at UNC-Greensboro, Plaintiff told Ms. Siler that pain from his compensable injury was a problem while sitting in classes and also while driving approximately 40 minutes from his home in Franklinville, North Carolina. Plaintiff had difficulty concentrating, walking across campus to get to classes, and sleeping due to pain, and he had difficulty focusing due to the pain medications he was taking. Plaintiff received low grades. Plaintiff told Ms. Caviness he could not physically handle the driving to Greensboro. She suggested that he look into a distance-learning program.
28. Plaintiff completed the fall semester of 2002 and the spring semester of 2003 at UNC-Greensboro, but he did not do well. Plaintiff enrolled again in the fall of 2003, but he had to withdraw.
29. Plaintiff received a nerve root block and facet injection in December 2002. It relieved his pain for approximately one month.
30. On July 30, 2003, Plaintiff underwent an Employability Assessment by Anissa D. Rice, a vocational rehabilitation consultant, at Defendant's request. Ms. Rice concluded that Plaintiff would have difficulty finding work in the information systems field with only an Associate's Degree.
31. In July 2003, Defendant assigned Cheryl Yates, R.N., as Plaintiff's medical case manager. When Ms. Yates first met Plaintiff, she noted that he appeared to be in acute pain, and that he had to change positions in his chair, stand up, and walk. She testified that he cooperated fully with medical case management. A repeat MRI on September 26, 2003, revealed significant nerve root encroachment at L5-S1. Plaintiff was referred to Dr. Max William Cohen for surgical evaluation. *Page 14 
32. In October 2003, Ms. Siler was instructed to close her vocational rehabilitation file, because of the exacerbation of Plaintiff's low back symptoms. Ms. Siler testified that Plaintiff would be better off finishing his Bachelor's Degree before he resumes job search activities. When she closed her file, she understood that Plaintiff was going to complete his degree and secure employment in the computer industry.
33. Dr. Cohen is an orthopedic surgeon with a subspecialty in spine surgery. Dr. Cohen recommended that Plaintiff undergo lumbar fusion surgery. Plaintiff agreed to proceed with the lumbar fusion in April 2004 because "I just got to the point where I couldn't function at all." He could not sit upright, stand, sleep, or drive 5 miles to the grocery store. He had constant pain that he felt was a nine or ten on a scale of ten. His left foot was frequently so numb he could not feel it. Dr. Cohen testified that his goal in performing the lumbar fusion was to decrease Plaintiff's medications, improve his function, and allow him to stand and sit longer.
34. After the fusion surgery, Plaintiff had no pain for the first three to four months. Then the pain gradually started coming back and Plaintiff was prescribed Oxycontin. Dr. Cohen also ordered an epidural steroid injection in November 2004.
35. On June 1, 2004, Ms. Yates and Plaintiff met with Dr. Cohen. Plaintiff told Dr. Cohen that he was applying to begin online courses in August 2004. Dr. Cohen thought the online courses were "very appropriate." Ms. Yates described Plaintiff as very excited about his classes and excited that he could go to school without driving.
36. On August 27, 2004, Dr. Cohen released Plaintiff at maximum medical improvement and assigned him an additional 15% permanent partial impairment rating to the back. Dr. Cohen also assigned permanent work restrictions of no lifting over 15 pounds, no repetitive bending, stooping, or squatting, and no prolonged standing or sitting. *Page 15 
37. In August 2004, Plaintiff enrolled in Westwood College, an online college program. He has done well taking courses online. He is able to complete the coursework any time of the day or night. Westwood College charges approximately $4,700.00 for a twelve-hour semester course load. The books cost approximately $1,500.00 to $1,800.00 for the six courses he has completed.
38. Plaintiff received $15,000.00 in Sallie Mae student loans for the Westwood online college program. Westwood College is not an approved vendor for NCDVR and has refused to complete the necessary paperwork to become an accepted vendor with the State. Plaintiff subsequently transferred from Westwood College to Virginia College at Birmingham.
39. Plaintiff is working towards a Bachelor's Degree in Computer Information Security Systems. At the time of the hearing before the Deputy Commissioner, Plaintiff had completed 80 credits towards the 120 credits he needs for his degree. Plaintiff estimated that he has four semesters left to complete his degree.
40. Plaintiff chose Information Security Systems as his major so that he could work from home. It is unlikely that Plaintiff will be able to work a regular 40-hour work week because he cannot stand or sit for prolonged periods of time, needs rest breaks as necessary, and has days when he will not be able to work at all. Working from home using the internet or a virtual private network would allow Plaintiff to perform work at his own pace for companies throughout the United States without traveling.
41. According to Dr. Cohen, Plaintiff benefits psychologically from studying and focusing on school: he substitutes mental stimulation for pain medication and school is the best therapy for him. Dr. Cohen is of the opinion that Plaintiff would benefit from a prescription for vocational training online. *Page 16 
42. Dr. Cohen opined, and the Full Commission finds as fact, that Plaintiff will not be able to work an eight-hour day because of the episodic nature of his pain. Dr. Cohen assigned more specific permanent work restrictions for Plaintiff during his February 27, 2006, deposition. He limited Plaintiff to 45 minutes of sitting followed by 20 minutes of standing and walking and 5 minutes of standing in one place. Plaintiff should also be allowed to lie down between 5 and 20 minutes at a time, four to five times during an eight-to ten-hour day. Dr. Cohen testified that these work restrictions would allow Plaintiff to function. He testified, "[w]e know that if we push his back beyond these restrictions, then he's going to decompensate and require either more medication or have a situation where he can't focus because of pain."
43. Defendant retained Michael Stickney, a vocational rehabilitation consultant, to perform a labor market survey. In his report dated March 14, 2006, Mr. Stickney concluded that a Bachelor's Degree was necessary for the "bulk of the positions" he identified. Mr. Stickney also concluded that certifications were not a reliable substitute for a Bachelor's Degree, since it was difficult to assess which certification you would need for a particular job, and the certifications are updated and changed regularly.
44. Stephen Carpenter, an expert in the field of vocational rehabilitation, testified that Plaintiff's functional capacity was within a reduced range of sedentary employment because of the problems he has with sustained sitting and the need to lie down up to 20 minutes, four to five times daily. In his opinion, this reduced range of employment made it even more important that Plaintiff have additional skills, i.e., a Bachelor's Degree, before he tries to enter the job market. Mr. Carpenter agreed with Ms. Siler that it is very difficult to place someone in a sedentary position in Randolph County without prior work experience in the position area. *Page 17 
45. Mr. Carpenter opined that, due to his restrictions, Plaintiff was permanently and totally disabled from full-time employment, but college training would allow him to perform part-time employment at a reduced range of sedentary work. Mr. Carpenter also opined that Plaintiff would not do well, physically or psychologically, if he did not continue his course work. Mr. Carpenter recommended self-employment for Plaintiff in the computer field because he would be in a highly marketable area that paid very well for part-time work.
46. Plaintiff testified that he wants to work as long as he can. He wants to go back to work, because he has worked all his life and he would rather be working.
47. Without vocational retraining in a program that is reasonably calculated to lead to a Bachelor's Degree in a career area where Plaintiff has the potential to get a job working from home at his own pace, Plaintiff is totally and permanently disabled. Plaintiff's current course of study in the area of Computer Information Systems is reasonably required to lessen his disability. All parties would benefit from Plaintiff's retraining efforts.
48. Plaintiff contends that Defendant should bear the costs of his retraining because, in the long run, it will likely be less expensive than paying permanent and total disability compensation. After obtaining his Associate's Degree, Plaintiff did not seek prior authorization or request funding from Defendant to pursue a four-year degree. He did receive a recommendation and some funding from NCDVR to enroll in classes at UNC-Greensboro in 2002. When he became physically unable to tolerate attending classes at UNC-Greensboro due to an increase in pain and his subsequent fusion surgery, he also received encouragement from NCDVR to pursue an online course of study. Plaintiff enrolled in Westwood College's online program in 2004, but could not receive any financial assistance from NCDVR because the college would not cooperate with the State's efforts to make it an approved vendor. Plaintiff did *Page 18 
not seek financial assistance from Defendant until he filed a Form 33 in July 2005. Defendant was aware through the reports of its assigned vocational rehabilitation consultant that Plaintiff intended to enroll in a four-year degree program at UNC-Greensboro. Although Defendant did not authorize Plaintiff to seek this additional vocational retraining, it did not specifically notify Plaintiff that the training was not authorized. Defendant should pay the costs for any credit hours that count toward Plaintiff's Bachelor's Degree; however, Defendant is not ordered herein to do so considering the circumstances of this case.
49. With respect to Plaintiff's future educational benefits, Defendant contends that if the employer is obligated to pay for Plaintiff's future education, it should be allowed to exercise the legal right to control that education by putting conditions on the payment and making sure that Plaintiff finishes on time and performs and learns at a level that will put him in a position to obtain work in a computer-related field. Defendant further contends that the employer's legal right to control education should allow Defendant to condition Plaintiff's educational benefits on the following:
 1) Plaintiff will take a full course load each semester until he graduates.
 2) Plaintiff will attend summer school each session in order to finish as soon as possible.
 3) Plaintiff is to maintain a "C" average. If Plaintiff's grades are poor and below this average there is little chance that the tuition paid by employer will result in Plaintiff's successful return to work in his new, chosen field.
 4) Employer is to receive grade transcripts, progress notes, and attendance reports either monthly or immediately following each semester. There must be some sort of monitoring of Plaintiff since he will not be in a *Page 19 
classroom where his attendance, effort, and performance would be witnessed and would be consistently documented.
51. Defendant also contends that, if it is to pay for Plaintiff's education, Plaintiff should have to be diligent and responsible in his studies. The Full Commission finds that some level of control and monitoring of Plaintiff's progress would be reasonable and that Plaintiff should be required to put forth his best efforts to make good grades and complete his degree as quickly as possible. Accordingly, Defendant should be given periodic reports and allowed to monitor progress through reasonable procedures established by Defendant in cooperation with Plaintiff.
52. In its discretion, the Full Commission finds, however, that due to Plaintiff's serious medical conditions related to his compensable injury, it would be unreasonable to require Plaintiff to always take a full course load. Plaintiff may not be medically able to attend summer school each session and there may be times when Plaintiff's condition seriously impacts his ability to concentrate sufficiently to maintain a "C" average. Therefore, Plaintiff's failure to meet preset goals and expectations may not be indicative of a failure to cooperate with reasonable vocational rehabilitation or medical treatment.
53. Neither party has shown good grounds for the award of attorney fees under N.C. Gen. Stat. § 97-88.1. Plaintiff had reasonable grounds for prosecuting this claim and Defendants had reasonable grounds for defending this claim.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following: *Page 20 
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident on May 12, 1997, while in the course and scope of his employment with Defendant-Employer. Defendant accepted Plaintiff's claim by the filing of a Form 60 with the Industrial Commission. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has proven by the greater weight of the medical and vocational evidence that he is unable to earn the same wages he earned before the injury on May 12, 1997, either in the same employment or in other employment, without retraining, and that self-employment is a viable option for him, given his physical restrictions, aptitude, and level of determination. Industrial Commission Rules for RehabilitationProfessionals III (F)(7). With a four-year Bachelor's Degree there is a reasonable likelihood that Plaintiff will be able to maintain at least part-time, home-based employment where he has the opportunity to work at his own pace. It is undisputed that Plaintiff needs a Bachelor's Degree in order to provide him an opportunity for suitable employment that would pay him at or near his pre-injury average weekly wage. Russell v.Lowes Product Distribution, 108 N.C. App.762, 765; 425 S.E. 2d. 454, 457 (1993). N.C. Gen. Stat. §§ 97-2(9); 97-29.
3. Vocational retraining through education is a form of medical compensation under N.C. Gen. Stat. § 97-2(19), and the employer is responsible for paying educational expenses for retraining. Since Plaintiff benefits psychologically from focusing on his college work, vocational retraining has a medical benefit beyond the potential for affording Plaintiff an opportunity for suitable employment. Foster v.U.S. Airways, 149 N.C. App. 913, 563 S.E.2d 235 (2002). InFoster, the Court awarded plaintiff educational benefits in the form of community college tuition when she could no longer work as a flight attendant, by concluding *Page 21 
that education is a form of "medical compensation" under N.C. Gen. Stat. § 97-2(19). Once the Court concluded that education was a form of "medical compensation," the employer became legally responsible for paying the tuition under N.C. Gen. Stat. § 97-25. Foster was decided on a totality of the circumstances, case-by-case basis. The employer has control over the employee's medical treatment, subject to the Commission's discretion. Generally, an employee is not at liberty to procure his own medical treatment at the expense of his employer without the employer's knowledge or consent. Schofield v. Great Atlantic Pacific Tea Co., Inc., 299 N.C. 582; 264 S.E.2d 56 (1980). However, there are some exceptions.
4. All parties would benefit from the vocational retraining that Plaintiff has pursued since 1999, given the preponderance of the evidence showing that Plaintiff is unemployable without retraining, and that this vocational retraining has a reasonable potential to allow him to return to suitable employment within his physical restrictions. Defendants are not required to reimburse Plaintiff for the expenses, loans, and interest he has incurred while enrolled at UNC-Greensboro and through the online program at Westwood. Plaintiff admits that both programs were "missteps" and did little, if anything, to advance his ability to prepare for suitable employment. Schofield v. Great Atlantic Pacific Tea Co., Inc., 299 N.C. 582, 264 S.E.2d 56 (1980).
5. Plaintiff's current online course of study in the area of Computer Information Systems is reasonably required to lessen his disability. Plaintiff filed a Form 33 request in July 2005 alleging Defendant would not approve medical compensation for his online education directed toward a Bachelor's Degree in Computer Information Security Systems, including expenses for tuition, fees, transportation expenses, books and supplies, and a high speed internet connection for his online program. Plaintiff's notice to Defendant that he was seeking payment *Page 22 
of educational expenses was reasonably timely as to Virginia College at Birmingham. Plaintiff's current expenses associated with his enrollment in the online program at Virginia College at Birmingham are reasonable in light of the expected benefits to the employer when the employee is able to overcome his disabilities and obtain a job at wages equal to or greater than those he earned at the time of his injuries. In its discretion the Full Commission approves Virginia College at Birmingham as the institution to provide online college retraining for Plaintiff, and Defendant is required to pay the expenses described above. N.C. Gen. Stat. § 97-25.
6. Defendant shall suspend job search activities until Plaintiff completes his Bachelor's degree. Defendant shall be given periodic reports and shall monitor Plaintiff's progress through reasonable procedures established by Defendant in cooperation with Plaintiff. In light of his serious medical conditions, Plaintiff's failure to sometimes meet preset goals and expectations should reasonably be contemplated and, without additional evidence, should not be treated as the basis for a motion to suspend compensation for failure to cooperate with reasonable vocational rehabilitation or medical treatment.
7. Defendant and the third party administrator are ordered to assign a medical case manager to assist Plaintiff in coordinating ongoing medical care.
8. Plaintiff is not entitled to an award of attorney's fees and case expenses, as defendant did not unreasonably defend this claim. Defendant is not entitled to an award of attorney fees as Plaintiff had reasonable grounds to prosecute this claim. N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following: *Page 23 
 AWARD
1. Subject to the 20% attorney fee previously approved in this case, Defendant shall continue to pay Plaintiff temporary total disability benefits until further order of the Commission.
2. Defendant shall bear the reasonable costs of Plaintiff's schooling at Virginia College at Birmingham and establish a system to monitor progress in cooperation with Plaintiff. Defendant shall pay all the expenses, loans, and interest Plaintiff has incurred to date while obtaining his Bachelor's degree at Virginia College at Birmingham, including tuition, fees, supplies, books, transportation costs, and a high speed internet connection. Defendant shall pay all other medical expenses related to Plaintiff's injury which are reasonably required to effect a cure, provide relief, or lessen disability.
3. Defendant is ordered to suspend job search activities until Plaintiff completes his Bachelor's Degree or until further order of the Commission. Defendant shall assign a medical case manager to assist Plaintiff until further order of the Industrial Commission.
4. Defendant shall pay the costs of this action.
This the ___ day of November 2007.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER